Loring-, J.,
delivered the opinion of the court.
The petitioners in this case are Gilbert & Secor, claiming in their own right, and Courbland Palmer, who claims as assignee and executor of Samuel Dakin, deceased, and as assignee and administrator of Rutherford Moody and Eunice Moody, admin-istratrix of said Rutherford Moody.
The petitioners claim compensation for their dispossession by the United States, on the 1st November, 1856, of a floating dry dock at Mare Island, in the State of California, leased to them by the United States on the 17th March, 1856, for the term of three years therefrom.
And the court find the facts to be that, in pursuance of the acts of Congress of September 28,1850, (9 Stat. L., 516,) and of March 3,1851, (9 Stat. L., 622,) the Hon. William A. Graham, Secretary of the Navy, on behalf of the United States, on the 19th day of May, 1851, contracted in writing with John T. Gilbert, S. D. Dakin, Rutherford Moody, and Zeno Secor, that they, in consideration of the covenants and agreements in said *302 contract contained, should furnish all the materials and construct a floating dry dock of ten sections, with all the machinery, fixtures, and appurtenances necessary for working the same, according to the plans and specifications annexed to said contract, to be completed in two years from said 19th day of May, 1851, and placed at such site or point in the bay of San Francisco as the United States should designate.
And the contract provided, among other things, that the' contractors might construct the dock at such place on the coast of the Atlantic or Pacific Ocean as they might prefer, but that all the parts of the dock should be delivered to the United States put together complete, and in every respect ready for use in raising vessels at such point in the bay of San Francisco as the United States should designate before the dock was ready for use; and that the work should be forthwith commenced and progress in its several stages and periods of construction in proportion to the time stipulated for its completion, and should be completed in all respects within two years from and after the date of the contract; and that the contractors warranted the dock should be capable of successfully raising and sustaining for repairs a ship of the line of five thousand and three tons displacement, or a steamer of three hundred and fifty feet in length; and that the experiment for testing the power and capacity of the dock should be performed by and at the expense of the contractors, with a vessel to be furnished by the United States within three months after notice of the completion of the dock.
And, in the language of said contract, it was “further agreed that if the parties of the first part shall fail to comply in each and every particular with the specifications and provisions of this instrument, all the materials of every kind delivered and used upon the work shall be held and used by the United States as their property, as collateral security for advances made, or until a satisfactory adjustment of the case shall be concluded.”
And it was further agreed that all the materials and work of every description, shipped on the Atlantic coast for the said dock in California, should be fully insured and the policies of the insurance should be made payable in case of loss to the United States; and, in case ■ of loss, the insurance for loss or damage paid by or recovered from *303 the assurers should be held by the United States until the said materials, lost or damaged, shall have been replaced or the United States fully satisfied that they would be replaced ; and that if any default was made in progressing with the work and in the execution thereof, and especially if the said dock, after completion, should prove insufficient to dock successfully the vessels of the navy according to the warrant aforesaid, the contractors should forfeit and pay to the United States, as liquidated damages, the sums of money which may have been paid to them under the contract, with interest at six per centum, which liquidated damages might be recovered from time to time as they accrued; and the materials were not to be removed until the moneys and interest so advanced should have been refunded, but the said materials were to be held and used as the property of the United States as an additional security for the performance of the contract in all its parts ; and that the said dock should be constructed under the supervision of a competent naval constructor or other person, appointed by the United States, who should have power to reject any materials or workmanship from said dock which in his judgment were not suitable for their purpose, and who should see that said dock was constructed in conformity to said plans and specifications y and the United States covenanted and agreed, in consideration of the premises and of the covenants and agreements in said contract contained on the part of the said contractors, to pay to them, their heirs, executors, administrators, and assignees, the sum of $610,000, at the times and in the sums and manner specified in said contract.
The contractors having, according to the requirement of said contract, prepared the materials of the dock in the city of New York ready for shipment to California, on the 21st of November, 1851, notified the department of the fact, and asked that the place or site in the bay of San Francisco to which the materials should be sent might be designated 5 and, on the 22d November, 1S51, they were informed by the department that the materials might be shipped to San Francisco, and before their arrival there the site for the dock should be designated.
At this time the United States contemplated the construction of a basin or pier at the site of the dock, without which it could not be set up or worked. The vessels laden with the materials of the dock arrived at San Francisco, but the site of the *304 dock bad not been fixed nor a basin or piers constructed, and tbns tbe contractors were prevented from unlading and discharging tbeir vessels, and from proceeding in tbe execution of tbeir contract, and incurred expenses in demurrage, &c.
Tbe contractors then proposed to tbe Secretary of tbe Navy that they should select a site for tbe dock and construct a basin or piers for working it, in consideration that they should be allowed to use tbe dock in docking private vessels for tbeir own profit for three years from tbe completion of tbe dock. Tbe Secretary of tbe Navy submitted this proposition to Congress, and, by tbe act of July 21, 1862, (10 Stat. L., 16,) it was provided as follows: “And said dock may be used for tbe purpose of repairing merchant ships when not in use for the government, in such manner and for such compensation, and upon such terms and conditions, as shall be prescribed by tbe Secretary of tbe Navy.77
And, on tbe fourth day of August, 1852, another contract was made by tbe Hon. John P. Kennedy, Secretary of tbe Navy, on behalf of tbe United States, with S. D. Daken, Rutherford Moody, John T. Gibert, and Zeno Secor.
This second contract, after referring to the statutes above specified and to tbe previous contract, provided, among other things, that tbe United States, so soon as tbe said dock should be in all things completed and delivered according to tbe terms of tbe first contract, would, “ on tbe completion and'reception of said dock and appurtenances according to tbe contract and specifications thereof,77 surrender to the contractors tbe entire control of said dock and appurtenances, (unless it became necessary to deprive them of such control for docking vessels of tbe United States,) for them use and benefit for tbe term of three years from tbe date of tbe reception of said dock by tbe United States, and further, until notified by tbe Secretary of the Navy of bis intention to terminate tbe contract. And that tbe contractors should procure and provide at tbeir own cost and expense, and by tbeir own selection, at or near San Francisco, a safe and suitable site for tbe erection of said dock without cost to tbe United States of any sort, including demurrage and damage for detention of vessels and freight,* and to construct or procure safe and suitable piers and accommodations for tbe proper and safe working of said dock; and that they should keep tbe dock and appurtenances safely and in good and complete re *305 pair and condition at all times for tlie docking of vessels of the United States and others ; that they should at all times give preference to vessels of the United States, and, when required by the Navy Department, or the senior officer present, they should receive and dock any United States vessel without charge or expense to the United States, and should, at their own cost, paint the interior of said dock with the mineral paint provided and shipped by the Navy Department to California for that purpose, and keep the exterior of said dock well coated with paint and make good all breakage and damage and deliver the dock and appurtenances over to the United States, as therein-after provided, in good and perfect condition, reasonable wear excepted.
And that, with the exception of vessels of the Uniited States which are to be docked free of charge, the contractors should have the right on the entire and complete fulfillment of the conditions recited to establish a reasonable tariff of prices to be charged for the use of the dock, to accrue wholly to their use and benefit, which tariff shall be regulated and approved by the Secretary of the Navy ; and no greater amounts shall be charged for the docking of merchant vessels than shall be approved by him.
And that, by authority of a law oi Congress, this second contract- might be annulled at any time, and likewise might be annulled ami the control of the dock resumed by the Secretary of the Na. ry on the fa,ilure of the contractors to comply with any of the foregoing conditions; likewise by six months’ notice being given in writing to the contractors at any time before the expiration of the said term of three years; and that it might be so annulled by the Secretary of the Navy in writing at any time before the expiration of said t -rm of three years.
And that if, for any other cause than by default of the contractors to execute the covenants and agreements in this second contract by them to be performed, the Congress of the United States, by its act, shall, at any time before the expiration of the said term of three years, dispossess the contractors of the dock and its appurtenances, that then, if it shall be made to appear that the contractors have been at a greater outlay for the accommodations to work said dock .than the value and *306 receipts from its earnings, and the value of tbe said appurtenances for its accommodation erected or procured by them shall then at the time of their being dispossessed be' worth, the contractors should be entitled to receive from the United States, in consideration of said outlay and the deprivation of said premises, such sum or sums as Congress shall in its wisdom deem just and proper; and in like manner, if the Secretary- should deem it expedient to dispossess the contractors of the dock as before provided for before the expiration of the said three years, they should be entitled to receive from the United States such sum or sums as the Secretary of the Navy shall deem just and reasonable, provided Congress appropriate the money upon his recommendation.
And it was further agreed that the United States, the party of the second part, assume, after .its reception by them, the risk of said-dock against damage- or loss from lightning and fire only, and when proper care and watchfulness to guard the premises against accidents by those.elements shall have been duly exercised.
And it was further stipulated and agreed that if default should be made by the parties of the first part in any of the stipulations and conditions a-fore'said, that then, and in that case, the said parties will forfeit and pay to the United States the imnal sum of $610,000, the same being the contract price for the construction of said dock.
Under the contracts specified the contractors proceeded diligently in the execution of their contract, and, having selected a suitable site for the dock at Mare Island, they constructed and completed six sections of the dock, and thereafter continued to use the same for clocking and repairing vessels from November, 1853, until the completion of the dock in August, 1855, and in that time docked twenty-nine vessels of the United States free of charge, and also merchant vessels, and from the latter received a profit equal to $24,506 46 per annum.
Six sections of the dock admitted the docking of only one vessel at a time instead of two, and its use before its completion did not retard or interfere with its completion, .and was known and not objected to, but participated in by the government, and made under a- tariff fixed. by the contractors and approved by the Secretary of the Navy.
The ten sections of the dock were completed in August, 1855, *307 and tlie experiment for testing its power and capacity was not made until March, 1856, because of the failure of the United States to furnish a vessel for tlie purpose.
On or about March 17,1856, the dock was tested in the manner provided for by the contract, and thereupon accepted by the government, and the full contract price, including the ten per cent, reserve*! by the contract, was paid by the United States to the contractors 3 and then, to wit, on the 17th day of March, 1856, the dock, after its reception by the United States, was surrendered to the contractors, to be held and used by them for the term of three years from the date of the reception of said dock by the United States.
On the 20th of March, 1856, the Secretary of the Navy, the Hon. J. 0. Dobbin, by a written notice addressetl to Messrs. Dakin & Moody, Gilbert & .Secor, at New York, notified them that the exclusive possession of the floating dock at Mare Island, California, would be taken by the Secretary of the Navy on the 15th of November, 1856, and on that day the United States took possession of said dock and its appurtenances and dispossessed the contractors 3 and thereafter the contractors presented their claim for such dispossession to the Secretary of the Navy for his appraisal of the damages therefor, and he declined to determine the question whether the lease for three years provided for in the second contract commenced in November, 1853, when the use of six sections of the dock by the contractors began, or on 17th March, 1856., when the completed dock was accepted and received by the United States and then surrendered to the contractors. The contractors then presented their claim to the 37th Congress, and, on February 9, 1859, the Senate, by resolution, referred the matter to the Secretary of the Navy, who, on the 22d February, 1859, reported to Congress.
The claimants have since presented their claim to the Navy Department and its payment was refused.
Upon thé facts found by the court, a majority of the judges concur in the opinion (though for different reasons) that the claimants are entitled to judgment for the sum of $59,223 94. My reasons for my opinion are as follows:
It was contended on behalf of the United States that the lease of the dock for the term of three years commenced in November, 1853, when the claimants began to use six sections *308 of it, and ended three years thereafter, on November, 1856, when the government dispossessed the claimants. But by the contract, the thing to be leased was the whole dock and not six sections, or any other fractional part of it. And the dock was to be tested before it was accepted, and it was to be accepted before it was leased; and it was neither tested nor accepted till March 17,1856, when it was surrendered by the United States to the claimants according to the contract. And the words of the contract are express, and I think exclude construction or argument,• they are, “ for the term of three years from the date of the reception of the said dock by the United States.” And it is proved and admitted that the test and reception of the dock was not till March 17,1856.
Then the contract provided that the United States should assume, “ after its reception by them, the risk of said dock against damage or loss from lightning and ñre only.” And this shows that the United States were not to have the risks or rights of ownership in the dock till after its reception by them.”
Then it was claimed on behalf of the United States that the claimants had the benefit of the dock in the. profit derived from docking merchant vessels, from November, 1853, till March 17, 1856, and that a recoupment or allowance should be made for this. The use of the dock for the benefit of either party was not provided for by the contract, and is to be ruled by the equity between the. parties, and this depends on their respective legal rights.
By the provisions of the contract, the United States had a lien on the dock as security for their advances and the full performance of the contract, which required the possession of the dock to be by the claimants, and at their risk till its completion and acceptance. And tiis lien was the whole right of the United States, and they had no right whatever to the possession of the dock or to the benefit they derived from its use. The relation of the parties was that of mortgagee and mortgagor in possession, and in such case, by the rule in law and equity, the mortgagor, as general owner in possession, has a right to any use of the property not inconsistent with the lien and its security. And if the United States had a right to object to the use of the dock before its completion, they did not do so, but permitted it and participated in it by taking the benefit of having their own vessels docked and repaired free of charge to *309 them and at tbe risk and cost of the claimants. As thus the benefit of the use was mutual I think the benefit of one was the equivalent for the benefit of the other; and that the parties so intended is inferable from the fact that when the dock was accepted by the United States they paid the full contract price, including the ten per cent, reserved, without reclamation or claim for the antecedent use or objection of any kind.
Then it was claimed on behalf of the United States that the claimants, for the dispossession of the dock, are, by the express terms of the contract, “ entitled to receive from the United States such sum or sums as thp Secretary shall deem just and reasonable, provided Congress appropriate the money on Ms recommendation and that Congress not haying made the appropriation which would be their approval of the Secretary’s finding, that cannot be taken as the measure of compensation the contract provides. I think this is true, but immaterial, because it only remits the claimants to a quantum meruit on the evidence whether this action is or is not rested on the contract. And I think the claim here is not on the contract, but for a violation of it; and that the dispossession of the claimants was made by the government in November, 1856, not to determine the lease of three years during the term, but because they held that the term commencing with the use of six sections of the dock in November, 1853, expired in November, 1856.
It is observable that the notice of the Secretary to the claimants is dated March 20,1856, and states that possession will be taken on “ the first of November next,” and there is no perceptible reason for the specification of that date except the belief of the government that the three years would then have expired. And the notice is addressed to the claimants in New York, and would reach them there a day after it was mailed here. And I think the reason of the notice is this: by the terms of the contract the lease was to be “ for the term of three years from the date of the reception of said dock by the United States, and further until notified by the Secretary of the Navy, in ivriting, of Ms intention to determine the contract.” And thus the notice in writing was “to determine the contract” so as to prevent the lease from extending beyond what the department thought was the end of the three years, and the time the United States could take possession of the dock without incurring liability to the claimants for anything.
*310 That tbe department thought the lease ended in November, 1856, and acted upon that, is, I think, proved by the evidence. On the 1st of October, 1856, Admiral Smith, the chief of the Bureau of Yards and Docks, called the attention of the Secretary of the Navy to the lease of the dock at Mare Island, and said, “it has been inactive use by the contractors in docking vessels for their own benefit since 1853 ,• three years from that time will consequently expire on the seventh day of November next.’ And the testimony of the admiral is direct that the notice was given, because the three years.expired in November, 1856. In Ms report to Secretary Toueey, made in 1858, he said: “ The Secretary of the Navy notified' the contractors that on the first November following, which was three years from the time they had commenced to use the dock for their own benefit, the department would take possession of the dock; and accordingly about that time the government did take possession.” And in his deposition given in this case he says, in stating the substance of the transaction between the Secretary and the contractors, the Secretary of the Navy said to them: “ Yon have failed to complete the dock within the time specified; you have used it for the term specified of three years, and now I am going to take possession of it. He took possession of it, and dispossessed them of the dock.”
This testimony from the chief of the Bureau of Yards and Docks, to whose special jurisdiction the matter belonged, shows, I think, that the government acted on their belief that the lease of three years ended in November, 1856; and if so, then their notice of March 20 was not intended to determine the lease during the three- years, and was not the six months’ notice required for that purpose by the contract, and their dispossession of the claimants was not the execution of that purpose; but it was merely an unauthorized act induced by their misapprehension as to the commencement and expiration of the three years, and as such it was a wrongful dispossession of the claimants, from two years and five months of their term for three-years, and was thus a violation or breach of the contract for which the measure of damages is not to be fixed by the Secretary and Congress, nor under the contract, but by this court upon the evidence.
And the measure of damages is the profits the claimants would have made on their lease if they had continued in posses *311 sion till the expiration of the three years. Dpon this point the evidence shows that after the Dnited States took possession of the dock their receipts from it were at the. rate of $19,815 56 per annum, and this upon a tariff reduced by them fifty per cent, below that of the claimants, Avho on their tariff received from the dock $24,506 46 per annum. As these figures show a large increase in the business of the dock after the claimants were, dispossessed, I think they are entitled to as much as they received before their dispossession, which for two years and five months would amount to $59,223 94 j and this is the sum their i>etition claims.
In this case the petition contains a prayer for general relief, and therefore the claimants may recover on any cause of action shown by the evidence.
And we find as conclusions of law—
1. That by the contracts and facts above set forth, the Dnited States leased the dock abovementioned to said Samuel D. Dakin, Butherford Moody, John T Gilbert, and Zeno Secor, for the term of three years, from March 17,1856, and contracted with them that they should enjoy the same for said term, under and according to said contracts.
2. That by dispossessing said lessees on the 1st of November, 1856, the Dnited States became and are liable to pay to said lessees and their rejiresentatives, for their deprivation of the residue of said term, the net profits they would have received therefrom, which amount to said sum of $59,223 94.
Judgment is to be entered by the claimants for the sum of $59,223 94.